## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-19-181** |
| | * | |
| **RONDELL HENRY,** | * | ██████████████ |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

### REDACTED GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

On March 26, 2019, Defendant Rondell Henry left work in the middle of the day, stole a U-Haul van, and, after driving around the Washington, D.C., area, went to Dulles International Airport seeking to use the van to drive through a crowd of people—a plan reminiscent of the July 14, 2016, truck attack in Nice, France, that resulted in the deaths of 86 people. Not encountering a large enough crowd, Henry did not go through with his plan. He left Dulles, and he was later apprehended at the National Harbor, in Maryland, where he had parked the stolen U-Haul. ████

████████████████████████████████████████████████████████

████████████████████████████████ In light of the factors under 18 U.S.C. § 3553(a)—including the grave nature of the offense, the Defendant's personal characteristics, and the need to protect the public—the Government respectfully requests that the Court enter a sentence consistent with the plea agreement: a time-served term of imprisonment (amounting to more than 54 months at the time of sentencing) and a lifetime term of supervised release with conditions to ensure Henry's continued mental health treatment and compliance with prescribed mental health medication.

I.      **Background**

A.  Factual Background

In the middle of the workday on Tuesday, March 26, 2019, Henry left his workplace in Maryland.  ECF 130, Draft Pre-Sentence Investigation Report ("PSR") ¶ 11; ECF 123-1, Plea Agreement, Stipulation of Facts ("SOF") at 11.  While driving in Virginia, Henry observed a U-Haul van, which he followed to a parking garage and stole.  PSR ¶ 11; SOF at 11.

After driving around the Washington, D.C., area, including through Maryland and Virginia, overnight, Henry arrived at Dulles International Airport in the stolen U-Haul at approximately 5:00 a.m. on March 27, 2019.  PSR ¶ 11; SOF at 11.  In a later interview with law enforcement on April 3, 2019, Henry described his intention in stealing the U-Haul and traveling to the airport:  he "was trying to hurt people there" and he "was going to try to drive through a crowd of people." PSR ¶ 15; SOF at 11.  At that early hour, however, the airport lacked the large number of pedestrians the Defendant had hoped to find.  As he told law enforcement, "there wasn't a big enough crowd" at the airport.  PSR ¶ 15; SOF at 11.

Henry instead entered the terminal building, where he attempted to tail another individual into a restricted area of the airport but was prevented from doing so.  PSR ¶ 12; SOF at 11.  Henry then left Dulles in the stolen U-Haul, ultimately arriving at the National Harbor in Maryland later that morning.  PSR ¶ 13; SOF at 11.  Henry parked the U-Haul at the National Harbor, where it was found by law enforcement.  PSR ¶ 14; SOF at 11.  The following day, law enforcement located and arrested Henry.  PSR ¶ 14; SOF at 11.

During the April 3 interview with the Federal Bureau of Investigation, Henry not only revealed his plan to drive through a crowd of people with the stolen van, but also described his motivation.  Henry explained that he had "got[ten] wrapped up in some videos that [he] was

watching, al-Qaeda videos, and ISIS videos, and stuff like that." Ex. A, Int. Rec., at 1:03:36-1:06:29; Ex. A-1, Int. Tr., at 32; *see also* Ex. B, Affidavit of FBI Special Agent Michael Fowler ("Fowler Aff.") at ¶ 7. He felt that "Americans, the US government," were "partially responsible," along with other non-Muslims, for "the suffering of Muslims that are in the world." Ex. A, Int. Rec., at 2:40:21-2:41:15; Ex. A-1, Int. Tr., at 88. Believing that the ISIS fighters he observed in the videos were "being brave," Henry "thought [he] had to be brave too." Ex. A, Int. Rec., at 1:06:58-1:07:26; Ex. A-1, Int. Tr., at 33. Lacking knowledge of "how to make a bomb or fire a gun," he settled on "repeat[ing] what had happened in France with the truck driving through the crowd." Ex. A, Int. Rec., at 1:03:36-1:06:29; Ex. A-1, Int. Tr., at 32. In his own words, Henry "was just going to keep driving and driving and driving. . . . I wasn't going to stop." Ex. A, Int. Rec., at 1:50:46-1:51:30; Ex. A-1, Int. Tr., at 60.

Henry further advised that he "ended up at the National Harbor" because he "thought that that would be the best place for me you know to drive the truck, to find a crowd and drive the truck through." Ex. A, Int. Rec., at 1:03:36-1:06:29; Ex. A-1, Int. Tr., at 32. But, as with Dulles, when he arrived, "it wasn't as busy as [he] was expecting," so he parked the van. *Id.* While families and children that Henry observed caused him to have second thoughts regarding whether to proceed with his planned attack, Henry remained at the National Harbor, near the stolen van, until he was apprehended by law enforcement. *Id.*

A review of Henry's electronic devices and accounts corroborated his statements that he had used the internet to view Islamic extremist content. The search history for Henry's email account revealed searches for various terrorist groups and related content, including ISIS and Abu Bakr al-Baghdadi, the first caliph of the Islamic State until his death, dating back to at least 2016. Ex. B, Fowler Aff. ¶ 12. Data from Henry's Google email account and a hard drive located at

3

Henry's residence indicated that he had viewed videos with extremist Islamic content, including—as he had told the FBI—videos of ISIS fighting and executions. *Id.* ¶ 10; *see also* Ex. A, Int. Rec., at 1:06:58-1:07:52; Ex. A-1, Int. Tr., at 33.  And Henry's iPhone, which he had abandoned on the interstate in Maryland as these events were occurring, contained, among other things, an image of the seal incorporated into the ISIS flag and images related to the October 2018 shooting at the Pittsburgh Tree of Life synagogue.  Ex. B, Fowler Aff. ¶ 8.  Another phone, which Henry had previously used and had given to a family member, similarly revealed images of an ISIS flag, guns, and the individual who murdered 49 people at the Pulse night club in Orlando, Florida in 2016. *Id.* ¶ 9.

B.  Procedural Background and Plea Agreement

After the commencement of this action in April 2019, ███████████████████████████ ████████████████████████████████████████████████████████████████. *See* PSR ¶ 49.  In October 2019, the Court ordered an evaluation to determine Henry's competency to stand trial.  PSR ¶ 50.  Following a competency hearing, on February 28, 2020, the Court found Henry incompetent to stand trial.  PSR ¶ 50; ECF No. 44.

More than two years of restorations proceedings followed the Court's finding of incompetency. *Id.*  On May 3, 2022, the Court held a competency hearing and found Henry restored to competence.  PSR ¶ 50; ECF Nos. 81, 83.  Henry has remained detained since his initial appearance in April 2019.

On August 17, 2023, Henry pled guilty to a one count of Attempt to Perform Act of Violence at an International Airport, in violation of 18 U.S.C. § 37(a)(1), charged in a Superseding Information.  PSR ¶ 4.  Pursuant to the plea agreement, the parties agree that the appropriate sentence this case is a term of imprisonment of time served as of the date of sentencing and a

lifetime term of supervised release, including specific conditions requiring Henry's participation, supervised by the probation officer, in mental health treatment and compliance with mental health medication prescribed by his physicians and mental health treatment providers. *See* ECF 123, Plea Agreement, at 5-6 ¶¶ 9-10.

## II.   The Sentencing Guidelines

### A.  Calculation of the Sentencing Guidelines

As reflected in the Draft PSR, because the object of the offense would have constituted first degree murder, the base offense level is 33, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2A2.1.  PSR ¶ 21.  The Defendant has no prior criminal convictions.  PSR ¶¶ 31-33. After a three-level adjustment for acceptance of responsibility, the Guidelines for an offense level 30 and Criminal History Category I is 97 to 121 months.

The Government submits the offense level is further increased by 12 levels, pursuant to U.S.S.G. § 3A1.4, because the offense in this case was a felony that involved, or was intended to promote, a federal crime of terrorism, as defined in 18 U.S.C. § 2332b(g)(5).  U.S.S.G. § 3A1.4 & app. n. 1.   Section 2332b(g)(5) defines a "Federal crime of terrorism" as (1) a violation set forth in § 2332b(g)(5)(b)(B) that (2) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   Henry's offense of conviction, 18 U.S.C. § 37, is among the offenses listed in § 2332b(g)(5)(B).   18 U.S.C. § 2332b(g)(5)(B)(i).   Moreover, as detailed above, Henry's own statements, corroborated by electronic evidence from digital media and electronic accounts, reveal that, in committing this offense, Henry sought to support established Islamic extremist organizations, including ISIS, and to model himself after fighters for the Islamic State.  Under these circumstances, the terrorism enhancement under § 3A1.4 properly applies. *See*, *e.g.*, *United States v. Young*, 818 F. App'x 185,

193 (4th Cir. 2020) (enhancement applied where record "demonstrated [defendant's] support for and intent to advance ISIL's purposes"); *United States v. Elshinawy*, 781 F. App'x 168, 174 (4th Cir. 2019) (enhancement applied where defendant knew ISIS's purpose and "supported these goals in both word and deed); *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008) (enhancement applied where defendant obstructed investigation into jihadist training camps). If subject to the terrorism enhancement, Henry's criminal history category would be increased to category VI, pursuant to U.S.S.G. § 3A1.4(b). The resulting Guidelines range would be 360 months to life.

Though the Government believes that the terrorism enhancement applies, it does not believe that the Court need decide the question in order to sentence the Defendant. Consistent with the Federal Rules of Criminal Procedure, the Court may "determine that a ruling is unnecessary" on this issue "because the matter will not affect sentencing." Fed. R. Crim. P. 32(i)(3)(B). Here, Henry's sentence turns on the § 3553(a) factors, both parties have agreed that a specific sentence is appropriate, and both parties have waived many of their appellate rights. Irrespective of whether the terrorism enhancement under § 3A1.4 applies, the Court may consider Henry's statements to law enforcement and viewing of Islamic extremist content in connection with the nature and circumstances of the offense, along with all aspects of Henry's personal history and characteristics.

### III.     The Section 3553(a) Sentencing Factors Support the Agreed-Upon Sentence

Taking into account the nature and circumstances of the offense, the history and characteristics of the Defendant, and the need to protect the public, and other factors under 18 U.S.C. § 3553(a), the Government submits that sentence set forth in the parties' plea agreement—a time-served term of imprisonment and a lifetime term of supervised release, with

specified conditions relating to mental health treatment and medication—will be sufficient, but not greater than necessary to meet the purposes of sentencing.

Henry planned to unleash a violent attack, mowing down civilians with a large, stolen vehicle, in an attempt to replicate the deadly terrorist attack that occurred in Nice, France. He stole a U-Haul van to use in the attack and drove to an international airport seeking an adequately crowded target to achieve his aims. Although Henry ultimately did not carry out his planned attack, he took a substantial step to accomplish it. Similar truck attacks, including that in Nice, France, demonstrate the deadly potential of Henry's plan. *See, e.g.*, NPR, 8 in France are convicted of their roles in a Bastille Day truck attack that killed 86, *available at* https://www.npr.org/2022/12/13/1142517844/france-nice-bastille-day-truck-attack-trial-convictions; *see also* NY Times, Man Convicted in Terror Attack That Killed 8 on a Manhattan Bike Path, *available at* https://www.nytimes.com/2023/01/26/nyregion/saipov-convicted-bike-path-truck-attack.html.

██████████████████████████████████████████████████████████████

████████████████

It is essential that the sentence in this case not only reflect the seriousness of the offense, but also protect against other crimes by the Defendant in the future.  The immense gravity of the offense in this case supports the prison sentence that Henry has served—more than 54 months as of sentencing—and a lifetime term of supervised release to ensure, among other things, that Henry remains in compliance with mental health treatment and prescribed medication.  Such conditions, subject to ongoing supervision for the remainder of Henry's life, are essential to protect the public. Accordingly, the parties' agreed-upon sentence is consistent with the factors set forth in § 3553(a), including the nature and circumstances of the offense, the history and circumstances of the defendant, and the need for adequate deterrence, and should be imposed by the Court.

IV.     **Conclusion**

For the reasons set forth above, and others that may be presented at sentencing, the Government respectfully requests that the Court sentence the Defendant, Rondell Henry, consistent with the plea agreement, to a term of imprisonment of time served and a lifetime term

of supervised release, including the specified conditions of release. Such a sentence is reasonable

and not greater than necessary to meet the goals set forth in 18 U.S.C. § 3553.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:          /s/                                      
Jessica C. Collins
Jeffrey Izant
Assistant United States Attorneys