IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | Criminal No.  19-181 PX |
| v. | * | **SENTENCING MEMORANDUM** |
| RONDELL HENRY | * | **OF RONDELL HENRY** |

\* \* \* \* \* \* \* \* \* \* \* \*

## INTRODUCTION



Rondell Henry is a kind, soft-spoken man who came to the United States from Trinidad as a teenager.  Despite experiencing the separation of his parents, the death of his father, and a move to a new country without his immediate family all before he reached adulthood, Mr. Henry flourished here.  He graduated from high school and was the first in his family to obtain a college degree, having received his bachelor's degree from the University of Maryland University College.  Mr. Henry lived a quiet adult life working as an IT service desk technician, spending time with his family, and going to the mosque.

However, beginning in approximately 2018 Mr. Henry started to experience symptoms of a mental condition that dramatically altered his thinking.  He had delusional thoughts and became paranoid.  He spent more and more time alone and behaved in ways that were completely out of

1

character. We now know that he was experiencing the initial symptoms of Delusional Disorder and Schizophrenia. Those symptoms and the delusional thoughts became serious enough that on March 26, 2019 Mr. Henry left his job in the middle of the day, stole a U-Haul van, and drove it around the DC metro area. He went to the Dulles Airport and then to the National Harbor. When police took him into custody, he told them that he had been contemplating running the U-Haul van into a crowd of people. To be clear, Mr. Henry did not – at Dulles or at National Harbor – ultimately try to harm anyone. He explained to law enforcement that when he thought about the reality of harming innocent civilians, he did not act. But he acknowledges that his conduct amounted to a substantial step in an effort to commit the crime of performing an act of violence at an international airport.

Perhaps most importantly, Mr. Henry now recognizes that he has a mental health condition that will impact him for the rest of his life. While he was initially resistant to taking medication, he is now taking a regimen of medication on a daily basis. His family is thrilled to report that he is himself again. After over four and-a-half years behind bars, Mr. Henry is stable and reports no delusional thoughts or hallucinations thanks to the regimen that he is following. He is anxious to return to work, his family, and the law-abiding life he was leading before his mental health deteriorated.

Under the unique circumstances in this case, the parties negotiated a Rule 11(c)(1)(C) agreement in which Mr. Henry entered a guilty plea to one count of attempt to perform an act of violence at an international airport. The parties agree that the appropriate sentence here is the time Mr. Henry has served up to this point, which amounts to 54 months and 19 days. That sentence alone is by no means lenient: Mr. Henry, who had never before been arrested, has been behind bars since March of 2019, through the entire COVID pandemic, and he was moved between several

different jails and prisons all over the country during that time. The agreement between the parties calls for lifetime supervised release, with conditions to include mental health treatment and ongoing monitoring of Mr. Henry's medication compliance. ███████████████████████████████████████████████████████████████████ As the letters attached hereto attest, they are ready and willing to help Mr. Henry transition back into society. Mr. Henry will seek and obtain employment and will take part in ongoing treatment at a provider that United States Probation has identified near his residence.  In short, the sentence contemplated by the parties in the plea agreement is the right one in this case.  The parties ask the Court to impose a sentence of time served with lifetime supervised release.

## PROCEDURAL HISTORY

Mr. Henry was first arrested on March 28, 2019.  Following a lengthy interrogation by local and federal officers, he was taken for treatment to the Prince George's County Hospital, where he remained for four days before making an initial appearance on a criminal complaint charging him with Transportation of a Stolen Vehicle.  Mr. Henry was ordered detained and has been held in custody since his March 2019 arrest.  The government then filed a superseding indictment on August 28, 2019 adding a charge of Attempting to Provide Material Support and Resources to a Foreign Terrorist Organization.  Following extensive negotiations to resolve the matter, Mr. Henry pled guilty to a superseding information charging him with one count of Attempt to Perform an Act of Violence at an International Airport in violation of 18 U.S.C. § 37(a)(1). Sentencing is scheduled for October 23, 2023.

**ARGUMENT**

I. **Sentencing Guidelines Calculations**

The defense agrees with the guideline calculations in the Presentence Investigation Report ("PSR"). The base offense level under § 2A2.1(a)(1) is 33. Mr. Henry is entitled to a decrease of three offense levels based upon his clear demonstration of acceptance of responsibility and his timely notification of authorities of his intention to enter a plea of guilty. The PSR finds that the total offense level is therefore 30.

In its sentencing memorandum, the government devotes one paragraph to a contention that the terrorism enhancement under § 3A1.4 should be applied, which would result in a dramatic increase of the advisory sentencing range. United States Probation did not apply this enhancement. As an initial matter, the parties are in agreement that the Court need not decide this issue in order to sentence Mr. Henry. Pursuant to Federal Rule of Criminal Procedure 32(i)(3)(B) a Court may "determine that a ruling is unnecessary" on a particular sentencing issue "because the matter will not affect sentencing." Fed R. Crim. P. 32(i)(3)(B). The parties agree that a sentence of time served is appropriate here and recognize that the Court will take into account all relevant facts, described herein and in the government's sentencing memorandum, in determining the sentence based upon consideration of all § 3553(a) factors.

Nevertheless, the enhancement is inapplicable here. Section 3A1.4 only applies where the offense involved, or was intended to promote, a "federal crime of terrorism," as that term is defined in 18 U.S.C. § 2332b(g)(5). Section 2332b(g)(5) provides that a "federal crime of terrorism" is an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). The sole basis provided by the government for application of the enhancement is its claim that Mr. Henry "sought

to support established Islamic extremist organizations, including ISIS, and to model himself after fighters for the Islamic State." U.S. Memo, p. 5. First, the defense denies that evidence in the record establishes that Mr. Henry was acting to support an extremist organization. But just as importantly, proof of those allegations would not establish that Mr. Henry's offense was calculated to influence, affect, or retaliate against the government. Instead, those facts would only be sufficient to establish application of the enhancement if Mr. Henry had been convicted of a *different offense*: providing material support to a terrorist organization.[1] The § 3A1.4 enhancement does not apply and the Court should adopt the guidelines calculations set forth in the PSR.

## II.    The § 3553(a) Sentencing Factors Support the Sentence the Parties Agreed to

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). The parties are in agreement that honest application of the federal sentencing statute confirms that a sentence of time served (the equivalent of more than 54 months in custody) is sufficient and advances the goals identified therein. To determine the appropriate sentence, this Court must understand Mr. Henry, his background, and why he is now

---

[1] Both *United States v. Young*, 818 F. App'x 185, 193 (4th Cir. 2020) and *United States v. Elshinawy*, 781 F. App'x 168, 174 (4th Cir. 2019), cited by the government in its memorandum, are cases in which the defendant had been convicted of 18 U.S.C. § 2339B, attempting to provide material support to a designated foreign terrorist organization. As the Fourth Circuit explained in *Young*, where the crime of conviction is § 2339B, the government need not prove the specific intent to influence or affect the conduct of government. It need only show that the court could "reasonably infer by a preponderance of the evidence that [the defendant] intended to advance [the group's terrorist] purpose in providing material support." *United States v. Chandia*, 675 F.3d 329, 340 (4th Cir. 2012). Here, though, where § 2339B is *not* the crime of conviction, proof that a defendant intended to advance the purpose of a terrorist group – which the defense does not concede the government has done here – is not sufficient to establish that the enhancement applies. The only other case cited by the government, *United States v. Benkahla*, 530 F.3d 300, 311 (4th Cir. 2008), is also inapposite. In that case, the government had established that the defendant's offense involved jihadist training camps training people to fight the government of the United States. *Id.* at 312.

5

before the Court facing sentencing for his involvement in a criminal offense. The following discussion of Mr. Henry's life goes to many of the sentencing factors this Court must consider under § 3553(a), including his history and characteristics, the nature and circumstances of the offense, and the need for treatment and deterrence.

    A.    **Mr. Henry's History and Characteristics**

        i.    **Youth defined by parental separation, death of his father, and a move to United States**

Rondell Henry, now 32 years old, was born in Trinidad and Tobago, a small Caribbean island nation located off of Venezuela. Although his parents never married, they had been together for years by the time he was born and Rondell had two older brothers. Unfortunately, Rondell's parents separated when Rondell was four years old. His mother reports that their separation "shattered" Rondell. Following the split, Rondell and his brothers lived primarily with their mother but he remained in close contact with his father. The relationship was important to Rondell, so it was especially hard on him when his father fell ill and died from complications related to lung failure. Rondell, who was only 14 years old at



**Rondell and his father**

6



**Rondell (in Houston jersey) with his mother and siblings**

the time, was devastated. His mother then married ███ ███, a grocery store clerk. The two soon had a child, ███, who is Rondell's half-sister.

By the time he was 16 years old, Rondell was sent to the United States to live with an aunt and uncle in Maryland, and Rondell ultimately became a U.S. citizen. Despite being in an entirely new country away from his immediate family for six years, Rondell adapted quickly, attending school and working part time jobs. After graduating from high school, Rondell attended Montgomery County College before ultimately receiving his bachelor's degree from the University of Maryland University College. He was the first member of his family to earn a college degree.

### ii. Commitment to family

Mr. Henry has two older brothers and a younger half-sister. His oldest brother, ███, has struggled with a serious mental illness and remains in Trinidad living with extended family. According to his mother, ███ behaved similarly to the way she saw Rondell behave when he became ill in 2018: among other things, Raphael thought the TV antenna was "putting things in his brain" and broke it. Mr. Henry's next oldest brother, ███████████████. The siblings are all close: ███████████ have been in close contact with Mr. Henry throughout

7

this case and have communicated with defense counsel as a plan for Mr. Henry's release was developed. Mr. Henry's accomplishments inspired his younger sister ▮▮▮▮, who writes:

> I remember when I was a little girl, I would want to do everything I saw my brother doing, his character and mindset was so exceptional even as a young teenager, he became a role model to me up to this very day. . . . Whenever I feel like giving up, I remember my brother and then my determination sets in because my brother set that example for me.

Letter of ▮▮▮▮▮▮▮▮, attached as Exhibit 1.

Family has always been extremely important to Mr. Henry. His sister-in-law, ▮▮▮▮▮▮, is married to Mr. Henry's brother ▮▮▮▮. She reports that: "Despite being from a very different cultural background, he always made me feel welcome and part of the family." Letter of ▮▮▮▮▮▮, attached as Exhibit 1. Mr. Henry's friend ▮▮▮▮▮▮▮▮ recalls how concerned Mr. Henry was about his older brother ▮▮▮▮. ▮▮▮▮▮▮ is a Licensed Clinical Social Worker, and he recalls Mr. Henry asking him to meet with ▮▮▮▮ when ▮▮▮▮ visited the United States in order to offer his opinion and recommendations about how to address ▮▮▮▮▮▮ issues. Letter of ▮▮▮▮▮▮, attached as Exhibit 1. It is no surprise that Mr. Henry's step-father speaks of him with such high praise:

> My son has made me very proud; all of his hard work and determination was solely based off of his own goal for a better life than what he experienced growing up as a child. He moved to a new country when he just became a young adult, lived in a new home away from his family. He started college and excelled in his academic career while working part time and taking care of himself without his family by his side. Rondell was never a child you had to worry about, in regards to if he is being bad or doing something that was not good for him. He was just always focused on doing and producing better. He is truly an amazing son. Life was not easy for Rondell and Rondell did not let any difficulties determine the kind of person he wanted to grow up to be. He is my only child to graduate with a college degree and for that I am ever proud.

Letter of ▮▮▮▮▮▮▮▮, attached as Exhibit 1.

### iii. Religion

Mr. Henry began practicing Islam when he was 16 years old at the encouragement of his uncle. He began to fast during Ramadan, stopped eating pork, studied the Koran, and began going to the mosque to pray regularly. As an adult the Muslim community has been an important part of Mr. Henry's life. He volunteered at the Montgomery County Correctional Facility providing Friday Jummah services for the Muslim inmate population. Mr. ▮ recruited Mr. Henry to take on this role. According to ▮, Mr. Henry was a "dedicated, punctual, committed, responsible volunteer," who was well-liked by both inmates and staff at the facility. ▮ letter.

### iv. Steady employment and charitable endeavors

Mr. Henry initially worked at Home Depot in Shady Grove, but soon shifted to work as a service desk technician, working for three different companies over a five year period. His most recent employer was Hughes Network Systems in Germantown, Maryland. His job involved manning the service desk and triaging repair requests. In his free time, Mr. Henry sought to help those in need. His mother reports:

> From dedicating his time at the local Mosque teaching Sunday School to giving charitable contributions to the Helping Hand for Relief and Development Orphan sponsorship program to volunteering with his aunt at food drives for the elderly in the community when he just immigrated to the U.S. My son exemplified what it means to be a good human being.

Letter of ▮, attached as Exhibit 1.

### v. Onset of delusional thinking

Beginning in 2018, Mr. Henry experienced an onset of delusional thoughts similar to those his older brother had experienced. He began to see everyday occurrences in his life as messages to him. He believed that people were choosing their words, making certain hand gestures, wearing certain clothes, and arranging objects on surfaces in a particular way as a means of sending him

9

messages. He also started to believe that someone was going into his apartment when he was not there and moving things around. These suspicions eventually evolved into full-blown paranoia; he felt that he was being "monitored" and that there were cameras and recording devices hidden throughout his apartment. He whispered during conversations on the telephone and limited his conversation to one-word answers so that the recording devices would not pick up what he was saying. His brother ▇▇▇ recalls that Mr. Henry told him on the phone that he believed he was being followed, that colleagues were treating him strangely, and that he believed he was getting sick like his older brother. Letter of ▇▇▇▇▇▇, attached as Exhibit 1. He began to believe that he was caught in a struggle between two rival secret societies and in spring 2019 he started to believe that he needed to escape the bad secret society.

  **B.**  **Nature and Circumstances of the Offense**

  The statement of offense in the plea agreement accurately sets forth Mr. Henry's conduct in this case. Mr. Henry stole a U-Haul van and drove it around the metropolitan Washington, D.C. area in Maryland and Virginia for several hours. He stopped at Dulles Airport before dawn and parked the van using a valet. He went inside the terminal building, where he was observed reading arrival and departure screens for an extended period of time. He approached an airline representative at the check-in desk and spoke to him. In Mr. Henry's possession when he was ultimately arrested was a United Airlines document that was apparently printed at a ticketing kiosk indicating that there was no boarding pass in Mr. Henry's name. Mr. Henry was also observed walking behind an airline employee into a restricted area of the airport. When that employee stopped Mr. Henry from entering, he did not resist but instead walked away. Mr. Henry then took the van to National Harbor in Maryland. He parked the van and wandered around National Harbor, at one point riding the oversized Ferris Wheel. Mr. Henry ultimately boarded a private boat where

he slept for part of the night. Law enforcement arrested Mr. Henry when officers saw him on the dock in the early morning hours after he had left the boat.

After his arrest Mr. Henry was interrogated over several hours by local and federal officers. Undoubtedly because they had observed Mr. Henry's behavior and mannerisms, these officers transported Mr. Henry to Prince George's County Hospital on a petition for emergency evaluation. Mr. Henry was held at the hospital for four days, after which he was brought to federal court and ordered detained. He has remained in custody throughout the pendency of this case.

As this Court is no doubt aware, Mr. Henry's condition continued to deteriorate following his arrest and indictment. He was sent to a BOP facility in Washington State for a competency evaluation and in February of 2020 this Court issued an order finding that he was not competent to stand trial. After a delay of several months awaiting transport, Mr. Henry was finally transferred to the BOP Federal Medical Center in Butner, North Carolina. He remained there for almost two years. A BOP forensic psychologist found that Mr. Henry was suffering from Delusional Disorder.

Delusional Disorder is defined by the presence of delusions with a duration of one month or longer. Mr. Henry's delusions about the existence of two rival secret societies and his belief that he had the ability to spot and interpret various "signs" the secret societies used are a relatively common type of delusion called delusions of reference in which "events, objects, or other persons in one's immediate environment are seen as having a particular or unusual significance." American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (DSM-5), page 819. Later in his term of hospitalization at Butner, BOP mental health staff added a diagnosis of Schizophrenia. Mr. Henry initially refused to take medication prescribed by mental health staff and they observed persecutory and grandiose delusional beliefs and auditory hallucinations. He was isolative, rarely left his cell, and had little interest in eating.

11

In November of 2021 Mr. Henry for the first time agreed to voluntarily take medication and his condition improved immediately. BOP records indicate that his hallucinations diminished and he began to show insight into his symptoms. His family also saw the positive transformation. Mr. Henry's brother ▮▮▮▮▮ writes that once Mr. Henry started taking medication at Butner, his mental health greatly improved. Indeed, his condition improved so markedly that he was found competent to stand trial and was returned to the Central Detention Facility in Baltimore. There, he resumed normal meetings with his counsel and reports feeling much better. He takes a combination of medications that have proven effective: he no longer exhibits symptoms of the Delusional Disorder and Schizophrenia that were previously so controlling. Just as importantly, Mr. Henry recognizes the benefits the of the medications and is committed to continuing to take them. His brother ▮▮▮▮▮ reports that Mr. Henry has "shown a commitment to continue his treatment not just for his well-being but also for the sake of his family and by extension his community that he hopes he can rejoin. I have no doubt that if he is release[d], his commitment will not waiver especially with the support of our family." ▮▮▮▮▮ letter.

C.   **Need for Deterrence, to Protect the Public, and for Treatment**

This Court must consider the need for deterrence and protection of the public in determining an appropriate sentence here. In this case treatment is the key to assuring that Mr. Henry continues to flourish after his mental health crisis. Mr. Henry was not a threat to the public prior to this episode and he will never again pose any threat now that he is connected with services that will provide the treatment and medication that he needs.

The defense and United States Probation have developed a solid release plan for Mr. Henry that will ensure a smooth transition. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ His mother explains:

> During the past 4 years, we have met and spoken with various individuals involved in this case and because of this, we as a family have a much better understanding of Rondell's behavioral health condition and what is needed to help him successfully transition back to society. As a mother, I never want to experience this again with any of my children and I attest to you, and the court, that I will do everything in my power to support Rondell and help him become a productive member of society once more if given the opportunity.

▇▇▇▇▇▇ letter. Mr. Henry's younger sister writes: "We will be there for Rondell at all times, making sure that he is receiving his medication, assisting him with applying to jobs, and abiding to his probation guidelines, which I am sure he will not need much assistance with." Letter of ▇▇▇▇▇▇, attached as Exhibit 1. United States Probation has identified a mental health provider near the residence where Mr. Henry will receive treatment and medication. As the Court is aware, the parties have worked diligently to arrange for a supply of medication to be provided to Mr. Henry upon his release from custody at sentencing to cover the time between his release and his initial appointment at this provider. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

The assigned United States Probation officer has experience working with individuals with mental health diagnoses and will coordinate with the chosen community mental health provider. Mr. Henry is already stable and behaving like his old self. This team will work together to maintain the status quo and support Mr. Henry as he returns to work and normal life. Mr. Henry does not

13

at this point present any threat to the public, and his ongoing involvement in treatment while on supervised release will help to ensure that he never again engages in criminal activity.

## CONCLUSION

Considering the totality of the § 3553(a) factors, the parties respectfully request that the Court impose the agreed-upon sentence: time served (amounting to four and a half years in prison), followed by a lifetime term of supervised release to include mental health treatment. This negotiated disposition reflects an understanding of the unique circumstances that give rise to this conduct and Mr. Henry's remarkable turnaround while in custody.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

/s/
_____

Ned Smock
Cara Halverson
Assistant Federal Public Defenders
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Phone: (301) 344-0600
Fax: (301) 344-0019
Email: ned_smock@fd.org